AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

**FILED**

**Oct 21, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America<br>v.<br><br>BRIAN SEDGWICK<br><br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  2:25-mj-0157 SCR

REDACTED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ see below _____ in the county of _____ see below _____ in the _____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Count 1: 21 U.S.C. §§ 841(a)(1), 846. | Count 1: May 27, 2025 through Present - Conspiracy to distribute or possess with intent to distribute more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine or more than 50 grams of actual methamphetamine, in Sacramento, Shasta, Sutter, and San Joaquin Counties. |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

/s/ Alexander Malik

*Complainant's signature*

Alexander Malik, Special Agent, DEA

*Printed name and title*

Sworn to me and signed via telephone.

Date:  October 18, 2025

*Judge's signature*

City and state:  Davis, California

Sean C. Riordan U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT

I, Alexander Malik, Drug Enforcement Administration ("DEA") Special Agent, being duly sworn, hereby state:

### I.      PURPOSE OF AFFIDAVIT

1.      This affidavit is submitted in support of a Criminal Complaint and arrest warrants for the following people:

  i. Erick GUZMAN TOLENTINO ("GUZMAN TOLENTINO") – Counts 1 – 6;

  ii. ██████████████████████████

  iii. Elmer MONTIEL-ROMERO ("MONTIEL-ROMERO") – Counts 1, 2, and 4;

  iv. Leon James WHITELEY ("WHITELEY") – Counts 1 and 4;

  v. Juan MUNOZ-GUZMAN ("MUNOZ-GUZMAN") – Counts 1 and 5;

  vi. Lyle COOPER ("COOPER") – Counts 1 and 2;

  vii. ██████████████████████████

  viii. ███████████████████

  ix. Brandi EMERSON ("EMERSON") – Count 7;

  x. Brian SEDGWICK ("SEDGWICK") – Count 1; and

  xi. ████████████████████████████████

2.      This affidavit charges the individuals listed above with the following violations:

COUNT 1:

Beginning on an unknown date, but no later than on or about May 27, 2025, and continuing through the present date, in the Counties of Sacramento, Shasta, Sutter, and San Joaquin, State and Eastern District of California, and elsewhere, Erick GUZMAN TOLENTINO, ████████████, Elmer MONTIEL-ROMERO, Leon James WHITELEY, Juan MUNOZ-GUZMAN, ████████████, ████████████, and Brian SEDGWICK, did conspire and agree with each other and with persons both known and unknown to your Affiant to knowingly and intentionally distribute and possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

COUNT 2:

On or about August 15, 2025, in the County of Sacramento, State and Eastern District of California, Erick GUZMAN TOLENTINO, Elmer MONTIEL-ROMERO, and Lyle COOPER, aiding, abetting, and counseling one another, and commanding and procuring the commission of the following, did knowingly and intentionally possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).



COUNT 4:

On or about August 26, 2025, in the County of Sacramento, State and Eastern District of California, Erick GUZMAN TOLENTINO, Elmer MONTIEL-ROMERO, and Leon James WHITELEY, aiding, abetting, and counseling one another, and commanding and procuring the commission of the following, did knowingly and intentionally possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

COUNT 5:

On or about September 4, 2025, in the County of San Joaquin, State and Eastern District of California, Erick GUZMAN TOLENTINO and Juan MUNOZ-GUZMAN, aiding, abetting, and counseling one another, and commanding and procuring the commission of the following, did knowingly and intentionally possess with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

COUNT 6:

On or about September 5, 2025, in the County of Sutter, State and Eastern District of California, Erick GUZMAN TOLENTINO, did knowingly and intentionally distribute at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

COUNT 7:

On or about September 5, 2025, in the County of Sutter, State and Eastern District of California, Brandi EMERSON, did knowingly and intentionally possess with intent to distribute at least 50 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

3.      Additionally, this affidavit is submitted in support of a search warrant for the following locations, all described more fully in attachment A:

    i.      The residence located at 2019 Hammonton-Smartsville Road, Space 51, Marysville, CA ("Subject Premises 4"); and

    ii.     The residence located at 554 Washington Avenue, Yuba City, CA ("Subject Premises 5").

4.      The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843, and 846 (distribution of and possession with intent to distribute controlled substances, use a facility of interstate commerce in furtherance of drug trafficking, and conspiracy to do the same).  The items and evidence to be seized is more fully in Attachment B.

## II.      AFFIANT'S BACKGROUND AND EXPERTISE

5.      I am a Special Agent (SA) with the DEA and have been so employed since February 2022.  I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Titles 18 and 21 of the United States Code.  I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

6.      I completed DEA Basic Agent training at the DEA's Training Academy in Quantico, Virginia, where I received specialized training in narcotics investigations, to include training in the Controlled Substance Act, as set out in Title 21, United States Code, including but not limited to Sections 841 and 846, Controlled Substance Violations and Conspiracy to Commit

Controlled Substance Violations, respectively. I received training in search and seizure law, drug identification, drug-trafficking trends and methods, evidence gathering, undercover operations, physical and electronic surveillance, and many other facets of narcotics investigations.  After completing Basic Agent training, I was assigned to the DEA's Sacramento District Office Task Force Group.

7.      The DEA Task Force Group is a collaborative group of officers and agents from the DEA and state and local law enforcement agencies such as the Yuba County Sheriff's Department, Sacramento Sheriff's Department, Folsom Police Department, California Highway Patrol, Sacramento Police Department, El Dorado County District Attorney's Office, and California Department of Corrections and Rehabilitation.  The goal of the DEA Task Force Group is to investigate and disrupt illicit drug trafficking in specified geographical areas by immobilizing the highest levels of targeted violators and trafficking organizations.

8.      During the course of my employment as a DEA Special Agent, I have assisted and participated in criminal investigations targeting individuals involved in the trafficking of controlled substances, including but not limited to, fentanyl, methamphetamine, heroin, cocaine, cocaine base, methylenedioxymethamphetamine (MDMA), lysergic acid diethylamide (LSD), dimethyltryptamine (DMT), psilocybin, and marijuana.  While conducting such investigations, I have participated in a variety of investigative techniques and resources, including physical and electronic surveillance, and various methods of infiltration, including undercover operations and using cooperating sources.  Through these investigations, my training and experience, and conversations I have had with other agents and law enforcement officers, I am familiar with the methods used by drug traffickers to manufacture, transport, store, and distribute controlled substances, and to collect and launder drug proceeds.

9.      In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received

4

from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) Court-authorized interception of wire and electronic communications; (10) my training and experience as a DEA agent and/or; (11) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

10.     Because this affidavit is submitted for the limited purpose of supporting the requested Criminal Complaint and search warrants, I have not included the details of every aspect of the investigation.  I have set forth only the facts necessary to establish probable cause to charge the defendants listed in this affidavit and to search the locations listed in Attachment A. I have not intentionally omitted information that the Court would need to assess probable cause for the arrest of the defendants.

### III.     BASIS OF INFORMATION

11.     Between the period of May 12, 2025 through June 11, 2025, pursuant to Court authorization, agents implemented the interception of wire communications to and from a device used by Jose GARCIA-AVALOS, identified in the affidavit as Target Telephone 1.  Between the period of August 8, 2025, through September 6, 2025, pursuant to Court authorization, agents implemented the interception of wire and electronic communications over Target Telephone 1, used by GARCIA-AVALOS as well as Target Telephone 3, a device used by GUZMAN TOLENTINO.  During these periods, the defendants previously outlined were monitored speaking explicitly about their drug trafficking activities on monitored target telephones or were implicated criminally in conjunction with monitored intercepts on target telephones.

Additionally, agents tracked the movements of the cell phones subject to interception orders, cell phones of co-conspirators not subject to interception orders, and tracking devices affixed to vehicles used to facilitate drug trafficking all pursuant to search warrants authorized in the Eastern District of California. The intercepts, cell phone tracking data, and vehicle tracking data all aided visual and physical surveillance as more fully detailed below.

12.     Additionally, Special Agents of DEA and local officers have received information from three cooperating sources "CS," who are described below:

i.      CS-1 is cooperating with the DEA in exchange for monetary compensation for CS-1's work with law enforcement. DEA established CS-1 as a cooperator in June 2023. CS-1 has no pending criminal cases but does have a prior criminal history, which includes conspiracy to distribute crystal methamphetamine, possession of a controlled substance for sale, possession of a controlled substance, illegal entry into the U.S., and false identification to a peace officer. CS-1 knows information involving drug trafficking activities because CS-1, prior to cooperating, was a drug trafficker and incarcerated for methamphetamine trafficking. Because CS-1 has a history which includes providing false information to a peace officer, agents utilized various methods to verify and corroborate information provided by CS-1 including, but not limited to, consensually monitoring communications, toll analysis, controlled purchases of drugs, and physical surveillance during controlled purchases. Because agents corroborated the information provided by CS-1 relied on in this affidavit, I consider the information provided by CS-1 detailed below to be reliable in this case.

ii.     CS-2 is cooperating with the DEA in exchange for monetary compensation for CS-2's work with law enforcement. DEA established CS-2 as a cooperator in February 2019. CS-2 has no pending criminal

cases but does have a prior criminal history, which includes trespassing, damaging a wireless communication device, possession of a controlled substance for sale, sale of a controlled substance, robbery, battery, probation violation, and assault with a deadly weapon. CS-2 knows information involving drug trafficking activities because CS-2, prior to cooperating, was a drug trafficker who had been arrested for cocaine trafficking. Additionally, agents corroborated information provided by CS-2 through consensually recorded communications and physical surveillance.  For these reasons, I consider CS-2's information relied upon herein to be reliable.

iii.     CS-3 is cooperating with the Yuba County Sheriff's Office for consideration of pending state charges. Yuba County established CS-3 as a cooperator in May 2025.  CS-3 has prior criminal history, which includes convictions for lewd or lascivious acts with a child under 14, parole violations, petty theft, conspiracy to commit a crime, criminal threats, burglary, and failing to update registration as a sex offender.  CS-3 knows information involving drug trafficking activities because CS-3, prior to cooperating, was a drug trafficker who had been arrested by the Yuba County Sheriff's Office.  Agents corroborated CS-3's information through consensually recorded calls and surveillance.  For these reasons, I consider CS-3 to be reliable in this case.

### IV.     PROBABLE CAUSE

13.     Since July 2024, the DEA's Sacramento District Office (SDO) has been investigating a group of drug traffickers responsible for the distribution of large quantities of methamphetamine and other controlled substances in the greater area of Yuba City, California and elsewhere.  During this investigation, agents developed probable cause to issue arrest warrants for the individuals named above as well as probable cause to search the locations listed

herein.  Agents developed this probable cause through multiple controlled purchases of methamphetamine and other controlled substances, information from confidential sources, the interception of wire and electronic communication, and the seizure of controlled substances from transporters.

**A.      Jose GARCIA-AVALOS sold methamphetamine to a confidential source on multiple occasions within the Eastern District of California between July 2024 and May 2025.**

14.      On July 31, 2024, CS-1 placed several calls to an individual to arrange a methamphetamine transaction at a restaurant in Yuba, City.  An individual arrived to conduct the transaction in a gray Infiniti and identified himself as "Jose."  Agents would identify the person who conducted the transaction as Jose GARCIA-AVALOS ("GARCIA-AVALOS").  Agents surveilled and recorded the transaction as well as subsequent transaction.  Following the transaction, they took custody of the methamphetamine delivered by GARCIA-AVALOS which laboratory testing confirmed to be methamphetamine.

15.      At the July 31, 2024 transaction, GARCIA-AVALOS provided a contact number to CS-1.  Through the contact number provided by GARCIA-AVALOS, agents arranged other methamphetamine and M-30 tablet transactions where GARCIA-AVALOS delivered controlled substances to a confidential source.  These transactions took place between August 2024 and May 2025.  In May 2025, GARCIA-AVALOS used a cellphone identified as Target Telephone 1 to arrange controlled substance transactions, and on or about May 12, 2025, the Court authorized the interception of wire communications to and from Target Telephone 1.  In monitoring the intercepts over Target Telephone 1, agents overheard GARCIA-AVALOS request methamphetamine from ███████ a drug trafficker identified during a separate investigation.

16.      On May 27, 2025, GARCIA-AVALOS used Target Telephone 1 to discuss what agents believed was the sale of one pound of methamphetamine to another drug trafficker who agents saw meet with GARCIA-AVALOS in Chico, CA.  During the discussions, agents overheard GARCIA-AVALOS tell the other drug trafficker that GARCIA-AVALOS would

make a call. Agents interpreted this to mean that GARCIA-AVALOS was calling a source of supply to acquire methamphetamine for the transaction. That same evening at 6:51 p.m., GARCIA-AVALOS called ▄▄▄▄ using Target Telephone 1. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ During the call, GARCIA-AVALOS informed ▄▄▄ that a customer in Chico, CA needs "one." GARCIA-AVALOS then informed ▄▄▄ that he currently had $800, and would pay ▄▄▄ "the rest" upon returning from Chico, CA. On a follow-up call between ▄▄▄ and GARCIA-AVALOS at 6:55 p.m., ▄▄▄ instructed GARCIA-AVALOS to give him 20 minutes. ▄▄▄ then stated that he would see GARCIA-AVALOS at ▄▄▄ "house," to which GARCIA-AVALOS confirmed. Five minutes later, at 6:56 p.m., GARCIA-AVALOS spoke with his customer on Target Telephone 1. During the call, GARCIA-AVALOS informed the customer that he would be leaving Yuba City, CA, in 20 minutes.

17.     At approximately 7:05 p.m., Sacramento Sheriff's Department (SSD) detectives of the Special Investigations Bureau (SIB) observed GARCIA-AVALOS depart his residence of 1735 Oleander Drive, Yuba City, CA, in his gray Infiniti SUV (CA 9MXC518). At 7:16 p.m., GARCIA-AVALOS called ▄▄▄ using Target Telephone 1 and informed ▄▄▄ that he was at ▄▄▄ residence. ▄▄▄ informed GARCIA-AVALOS that he would be home in "less than a minute." At 7:17 p.m., surveillance observed GARCIA-AVALOS park in the vicinity of ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ Detective Ghaffarpour observed ▄▄▄ exit the white ▄▄▄▄▄▄▄▄▄▄▄▄▄ Detective Ghaffarpour was able to confirm



that the driver was ███████ by comparing a historical arrest photo of ███████ to what he observed in person. At 7:23 p.m., surveillance observed GARCIA-AVALOS depart the vicinity of ████████████████.

18.     At approximately 8:22 p.m., surveillance observed GARCIA-AVALOS park on Hemlock Street in Chico, CA. At 8:23 p.m., GARCIA-AVALOS called his customer using Target Telephone 1. During the call, the customer asked if GARCIA-AVALOS was "there," to which GARCIA-AVALOS confirmed that he was. Then, the customer informed GARCIA-AVALOS that she was "coming out." Surveillance was unable to maintain a consistent visual of GARCIA-AVALOS without alerting him of the investigation. However, surveillance did observe a white female adult exit the front passenger seat of GARCIA-AVALOS' gray Infiniti SUV (CA 9MXC518) shortly after the call at 8:23 p.m. Surveillance then observed the white female adult walk from GARCIA-AVALOS' vehicle to a small apartment building located on the south side of Hemlock Street, Chico, CA.

19.     Approximately three days later, on May 30, 2025, at 2:10 p.m. GARCIA-AVALOS called ███████ using Target Telephone 1. During the call, GARCIA-AVALOS asked ███████ if he had "one," to which ███████ confirmed that he did. GARCIA-AVALOS then stated that he would go "there" with "the money" and questioned if "it" was the same as "the yellow one," and ███████ replied that "it" was "white…clear stuff."

20.     At approximately 2:25 p.m., the Yuba County Sheriff's Office (YCSO) Problem Oriented Policing (POP) team located GARCIA-AVALOS in the vicinity of the Ross clothing store located at 1299 Colusa Avenue, Yuba City, CA, by utilizing GPS data from the court authorized GPS location device affixed to GARCIA-AVALOS' gray Infiniti SUV (CA 9MXC518). After locating GARCIA-AVALOS, surveillance observed an unidentified Hispanic male adult enter GARCIA-AVALOS' gran Infiniti SUV. Surveillance then observed the gray Infiniti SUV (CA 9MXC518) travel to ██████ ████ █ ████ ████ ████ ████ ██████ and park in the vicinity of the residence at 2:34 p.m. Surveillance then observed GARCIA-AVALOS depart the vicinity of ████████████████.

21.     At 2:35 p.m., ███████ called GARCIA-AVALOS on Target Telephone 1. During the call, ███████ asked GARCIA-AVALOS if he had just "pulled up," to which GARCIA-AVALOS confirmed. GARCIA-AVALOS then informed ███████ that his "friend" had forgotten the money, and that he would be back in "two or three" minutes.

22.     Surveillance observed GARCIA-AVALOS travel from █████████████ to the Wells Fargo Bank located at 900 Colusa Avenue, Yuba City, CA, where he parked in the vicinity of a white Honda SUV (CA 9UHF498) registered to Sonia Soto-Fernandez at 398 Alemar Way, Apartment 4, Yuba City, CA. Sergeant Machuca then observed Octavio HINOJOSA-GUZMAN exit the white Honda SUV (CA 9UHF498), walk to an ATM machine, interact with the machine, walk to GARCIA-AVALOS' gray Infiniti SUV (CA 9MXC518), then hand the unknown front passenger of the gray Infiniti SUV (CA 9MXC518) money. Surveillance then observed GARCIA-AVALOS travel back to the vicinity of █████████████.

23.     At █████████, surveillance observed ██████ exit ██████████████ enter the gray Infiniti SUV (CA 9MXC518), then depart the vicinity of the residence. Surveillance then travelled with the gray Infiniti SUV (CA 9MXC518) until it turned onto Wilkie Way in Yuba City, CA, where surveillance could not follow the vehicle without alerting GARCIA-AVALOS of the investigation. Moments later, surveillance observed the gray Infiniti SUV (CA 9MXC518) exit Wilkie Way and travel to Lincrest Elementary School in Yuba City, CA, where Detective Martinez observed GARCIA-AVALOS to be the sole occupant of the vehicle.

24.     On June 2, 2025, at 3:58 p.m., GARCIA-AVALOS called ██████ using Target Telephone 1. During the call, GARCIA-AVALOS stated that his cousin needed "one big one." Later in the call, GARCIA-AVALOS stated that "the guy" was waiting for his answer. ██████ then informed GARCIA-AVALOS that he was going to make a phone call, then call GARCIA-AVALOS back. At 4:01 p.m., ██████ called GARCIA-AVALOS on Target Telephone 1. During the call, ██████ instructed GARCIA-AVALOS to give him 15 minutes before "heading over."

11

25.     At approximately 4:47 p.m., while conducting surveillance at ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, the YCSO POP team observed GARCIA-AVALOS arrive in the vicinity of the residence as the operator of his gray Infiniti SUV (CA 9MXC518). Surveillance then observed GARCIA-AVALOS exit the vehicle, then enter ▮▮▮▮▮▮▮▮▮▮▮. Approximately 6 minutes later, surveillance observed GARCIA-AVALOS exit the residence, enter the gray Infiniti SUV (CA 9MXC518), then depart the vicinity ▮▮▮▮▮▮▮▮▮▮.

**B.     On June 11, 2025, GARCIA-AVALOS delivered five pounds of methamphetamine to CS-1.  Before the transaction, agents saw MONTIEL-ROMERO make a delivery to ▮▮▮▮▮▮ and then, GARCIA-AVALOS met with ▮▮▮▮▮▮**

26.     On the days leading up to June 11, 2025, CS-1 arranged the purchase of 5 pounds of methamphetamine from GARCIA-AVALOS under the direction of controlling agents.  On June 11, 2025, at 12:17 p.m., GARCIA-AVALOS called ▮▮▮▮▮ using Target Telephone 1. During the call, GARCIA-AVALOS stated that he needed "five" for "that guy." ▮▮▮▮▮ stated that once GARCIA-AVALOS went to ▮▮▮▮▮ residence with the money, ▮▮▮▮▮ would go "pick it."

27.     At approximately 12:53 p.m., YCSO POP team Detective Jacob Balentine observed GARCIA-AVALOS' gray Infiniti SUV (CA 9MXC518) arrive in the vicinity of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. GARCIA-AVALOS then entered the residence, shortly after arriving. At approximately 1:17 p.m., SA Andrew Peters observed ▮▮▮▮▮▮▮▮▮▮▮▮, enter his ▮▮▮▮▮▮▮▮▮▮▮▮▮), depart the vicinity of the residence, and travel to the vicinity of the Quick Stop located at 1757 Live Oak Boulevard, Yuba City, CA. After arriving at the Quick Stop, officers observed an unknown Hispanic male adult enter ▮▮▮▮▮▮▮▮▮▮▮▮▮▮), carrying a grocery bag. The unknown Hispanic male adult then exited the ▮▮▮▮▮▮▮▮▮▮▮▮) empty-handed, then returned to a maroon Ford sedan (CA 6LFF862), registered to Elmer MONTIEL-ROMERO at 676 Sutter Street, Yuba City, CA. TFO Torres later confirmed the unknown

Hispanic male adult to be MONTIEL-ROMERO by comparing a driver's license photo of MONTIEL-ROMERO to what he observed in person on the day of the controlled purchase.

28.    Following the interaction with MONTIEL-ROMERO, surveillance observed the ███████████████████) travel back to ████████ stopping briefly at the 7-Eleven located at 929 Market Street, Yuba City, CA, on the way. At approximately 1:57 p.m., Detective Ballentine observed the ██████████████████ arrive back at ██████████████████. ████████ then exited the ██████████████████), carrying the grocery bag, then entered the residence. At approximately 2:00 p.m., Detective Ballentine observed GARCIA-AVALOS exit ██████████████ carrying the grocery bag. Shortly thereafter, ████████ exited ███████ ████████████. Surveillance observed GARCIA-AVALOS enter the gray Infiniti SUV (CA 9MXC518) while ████████ entered the ████████████████████). GARCIA-AVALOS and ████████ then exited the vicinity of ████████████████ in tandem, in their respective vehicles.

29.    At approximately 2:08 p.m., surveillance observed the gray Infiniti SUV (CA 9MXC518) and the ████████████████████) enter the vicinity of the predetermined meet location, the Taqueria Guadalajara located at 1380 Franklin Boulevard, Yuba City, CA. At approximately 2:09 p.m., surveillance observed CS-1 park CS-1's vehicle in the vicinity of the gray Infiniti SUV (CA 9MXC518). GARCIA-AVALOS then exchanged 5 pounds of methamphetamine in a gray grocery bag for DEA official advanced funds while inside CS-1's vehicle. GARCIA-AVALOS then returned to the gray Infiniti SUV (CA 9MXC518). ████████ then exited the ████████████████) and entered the gray Infiniti SUV (CA 9MXC518). ████████ then exited the gray Infiniti SUV (CA 9MXC518), returned to the white ██████████████), then departed the meet location. GARCIA-AVALOS then departed the meet location separately, in the gray Infiniti SUV (CA 9MXC518).

30.    Based on my training and experience, I believe that ████████ was given some or all of the five pounds of methamphetamine in advance by MONTIEL-ROMERO, then gave some or all of the methamphetamine in advance to GARCIA-AVALOS. Therefore, ████████ accompanied GARCIA-AVALOS to the controlled purchase to observe the transaction, then

immediately collect the money for the methamphetamine, to immediately pay MONTIEL-

ROMERO for the methamphetamine given to ███████ in advance.

31.    Agents submitted suspected methamphetamine found inside the gray grocery bag

sold to CS-1 to the DEA Western Regional Laboratory for analysis and safekeeping. The

analysis resulted positive for methamphetamine, weighing 2204 grams and more than 500 grams

of a mixture or substance containing a detectable amount of methamphetamine.

**C.    The Court authorized the interception of wire and electronic communications over Target Telephones 1 and 3 used GARCIA-AVALOS and GUZMAN TOLENTINO, respectively, to facilitate drug trafficking activities.**

32.    In a separate investigation, DEA with state and local partners seized multiple

kilograms of methamphetamine through controlled substance purchases coordinated through

recorded communications between GUZMAN TOLENTINO, ████████ and an undercover DEA

agent.  Through these communications, agents coordinated controlled substance deliveries and

seized controlled substances.  On or about October 31, 2023, while coordinating with DEA in the

separate investigation, officers arrested and the State of California charged GUZMAN

TOLENTINO for possession with intent to distribute approximately 50 pounds of

methamphetamine in Sutter County, California.  GUZMAN TOLENTINO posted bond, secured

his release from custody, and fled prosecution.  Thereafter, for his drug trafficking activities, on

June 26, 2025, a grand jury in the Eastern District of California returned an indictment charging

GUZMAN TOLENTINO with one count of conspiracy to distribute and possess with intent to

distribute controlled substances and three counts of distribution of controlled substances

occurring between November 13, 2022 and October 31, 2023.

33.    In the instant investigation, and during the intercepts of GARCIA-AVALOS, a

cooperating source, CS-3, provided Target Telephone 3 to investigators as a methamphetamine

source of supply. CS-3 communicated during recorded calls with the user of Target Telephone 3,

and a DEA agent who oversaw the investigation which led to ███████████████

indictment recognized ████████████████s voice as the user of Target Telephone 3.

14

Later, CS-3 provided CS-2's law enforcement monitored telephone number to GUZMAN TOLENTINO, to facilitate a controlled purchase between CS-2 and GUZMAN TOLENTINO. Additionally, following intercepted communications arranging a methamphetamine transaction between ▮▮▮▮ and GARCIA-AVALOS, toll records showed that ▮▮▮▮ contacted Target Telephone 3 immediately after telling GARCIA-AVALOS that he (▮▮▮▮ would call the source of supply. This led investigators to believe that GUZMAN TOLENTINO supplied methamphetamine to ▮▮▮▮ using Target Telephone 3 so that ▮▮▮▮ could supply GARCIA-AVALOS.

34.      Based, in part, on this information, the Court authorized the interceptions, among other facilities, wire and electronic communications over Target Telephone 1 (used by GARCIA-AVALOS) and Target Telephone 3 (used by GUZMAN TOLENTINO), among other facilities. Between August 8, 2025 and September 6, 2025, agents overheard communications through Target Telephones 1 and 3 which led to seizures of controlled substances, identification of co-conspirators, and locations used by the conspirators to facilitate their drug trafficking activities.

**D.      Probable cause to search 554 Washington Avenue, Yuba City, CA ("Subject Premises 5"): on August 14, 2025, agents saw MONTIEL-ROMERO retrieve a bag from Subject Premises 5 before delivering 17 pounds of methamphetamine to CS-2.**

35.      During the investigation, agents monitoring a court-authorized tracking device on the maroon Ford sedan (CA 6LFF862) noted that it travelled to and stopped momentarily near a residence located at 554 Washington Avenue, Yuba City, CA (Subject Premises 5). On August 4, 2025, NET-5 Detective Roper conducted an address check of 554 Washington Avenue, Yuba City, CA. Upon conducting the address check, Detective Roper observed a blue Honda sedan (CA 9HUN360) registered to Mario Zuno Godinez at 4899 Campbell Avenue, Apartment 4, San Jose, CA, backed into the driveway of the residence.

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

36.     On the days leading up to August 14, 2025, CS-2 communicated with ███████ ███████████ in order to purchase 17 pounds of methamphetamine. CS-2 and ███████ ███████████ agreed to conduct the transaction in Yuba City, CA. On August 14, 2025, in anticipation of the controlled purchase, agents established surveillance at 1165 B Street, Yuba City, CA, the residence of MONTIEL-ROMERO. Shortly after establishing surveillance, agents observed MONTIEL-ROMERO exit 1165 B Street, walk to the blue Honda sedan (CA 9HUN360) which had been seen at Subject Premises 5, enter the sedan, then travel directly to 554 Washington Avenue, followed by surveillance.

37.     Once at 554 Washington Avenue, surveillance observed MONTIEL-ROMERO exit the blue Honda sedan (CA 9HUN360), then walk out of view towards the front of the residence. Shortly thereafter, MONTIEL-ROMERO walked back into view from the front of the residence carrying a small black suitcase, entered the blue Honda sedan (CA 9HUN360) with the black suitcase, then departed the vicinity of 554 Washington Avenue, followed by surveillance.

38.     Surveillance followed MONTIEL-ROMERO until he arrived at the O'Reilly Auto Parts located at 1660 Lincoln Road, Yuba City, CA. MONTIEL-ROMERO remained there momentarily before departing followed by surveillance. At approximately 2:18 p.m., surveillance observed MONTIEL-ROMERO arrive at the O'Reilly Auto Parts located at 839 Colusa Avenue, Yuba City, CA, where he parked next to CS-2's vehicle.

39.     Once parked next to CS-2's vehicle, surveillance observed MONTIEL-ROMERO sell 17 pounds of methamphetamine to CS-2 in exchange for DEA official advanced funds, noting that the methamphetamine was packaged in the small black suitcase that MONTIEL-ROMERO retrieved from 554 Washington Avenue. MONTIEL-ROMERO then returned to the blue Honda sedan (CA 9HUN360) and departed the vicinity of the meet location, where surveillance was terminated.  Agents sent the 17 pounds of methamphetamine to the DEA Western Regional Laboratory for analysis and safekeeping, the results of which were positive for methamphetamine.

16

**E.**    **Probable cause for Counts 1 and 2 supporting a complaint and arrest warrants for** ██████████████, **MONTIEL-ROMERO, and** ████████ **on August 15, 2025,** ████████████████, **MONTIEL-ROMERO, and** ████████ **possessed with intent to distribute 51 pounds of methamphetamine seized by law enforcement.**

40.    On August 9, 2025, at 5:31 p.m., ████████████████ used Target Telephone 3 to call an individual who law enforcement would identify as COOPER. During the call, ████████████████ referred to ████████ as "██████ ████ stated that he was "by the college" and could "go wherever." ████████████ instructed ████████ to travel to Panda Express in "twenty minutes." ████████████████ asked ████████ if he needed a "whole one," to which ████████ confirmed. At 5:52 p.m., ████████████████ called ████████ using Target Telephone 3. During the call, ████████████████ instructed ████████ to go to "O'reilly parts" on Colusa Avenue in Yuba City, CA.

41.    On the same date, at approximately 5:57 p.m., surveillance units consisting of law enforcement officers from DEA Sacramento Task Force, YCSO POP, and Narcotics Enforcement Task Force (NET-5) set up in the vicinity of the O'Reilly Auto Parts located at 839 Colusa Avenue, Yuba City, CA. Surveillance observed the same maroon Ford sedan (CA 6LFF862) that had been operated by MONTIEL-ROMERO during the controlled purchase operation on June 11, 2025 arrive in the vicinity of the O'Reilly Auto Parts. YCSO POP Detective Zepeda observed the driver of the maroon Ford sedan (CA 6LFF862) to be Lyle ████████ Zepeda was familiar with ████████ from prior interactions with ████████ unrelated to the instant investigation, and Zepeda recognized ████████ Additionally, TFO Torres has had multiple interactions with ████████ and TFO Torres recognized ████████ voice during the intercepts. Also, intercepts between ████████████████ and ████████ on August 13, 2025, indicated that ████████ purchased the maroon Ford sedan (CA 6LFF862) from MONTIEL-ROMERO.

42.    On August 9, 2025 at 6:06 p.m., surveillance observed MONTIEL-ROMERO operating his blue Honda sedan (CA 9HUN360) arrive in the vicinity of the O'Reilly Auto Parts. ████████ and MONTIEL-ROMERO then travelled in their respective vehicles, in tandem, to the

vicinity of East Onstott and Northgate Drive in Yuba City, CA. Surveillance then observed MONTIEL-ROMERO exiting the maroon Ford sedan (CA 6LFF862) operated by ███████ I note that surveillance was unable to observe MONTIEL-ROMERO entering the maroon Ford sedan (CA 6LFF862) without possibly compromising the investigation by following the subjects too closely. MONTIEL-ROMERO then departed the vicinity of the maroon Ford sedan (CA 6LFF862) as the operator of the blue Honda sedan (CA 9HUN360).

43.    On August 10, 2025, at 4:26 p.m., ████████████████ called ██████ using Target Telephone 3. During the call, ███████████ stated that "they" were leaving at 5:20, to which ██████ asked if they were leaving at 5:30. ████████████ stated that "they" were leaving "today." At 5:27 p.m., ████████████ called ██████ using Target Telephone 3. During the call, ███████████ stated that "he" was waiting for ██████ at "the church" and asked how long it would be for ██████ to arrive. ██████ stated that he would arrive in "twenty." I note that during the authorized period of interception, ███████████ was believed to reside in Mexico. However, ██████ often states that he will be arriving, or that he is waiting, when talking with his associates and co-conspirators.

44.    That same day, at 5:57 p.m., ████████████ called ██████ using Target Telephone 3. During the call, ████████████ questioned whether ██████ was "going or not." ████████████ stated that ██████ should advise ███████ if ██████ is not going so that ████████████ can "find somebody else." COOPER informed GUZMAN TOLENTINO that he would be "there" in 10 minutes. Surveillance did not observe COOPER and MONTIEL-ROMERO meet. However, electronic surveillance of a court-authorized GPS tracking device affixed to the maroon Ford sedan (CA 6LFF862) indicated that the maroon Ford sedan (CA 6LFF862) travelled southbound away from Yuba City, CA, ultimately terminating travel in Colton, CA (San Bernardino County).

45.    On August 11, 2025, at approximately 3:30 a.m., Rialto PD Detectives utilized GPS tracker information to locate and establish surveillance on the maroon Ford sedan (CA

6LFF862) at an apartment complex located at 2069 West San Bernardino Avenue, Colton, CA. At approximately 6:18 a.m., surveillance observed MONTIEL-ROMERO enter the vehicle, then travel to the Motel 6 located at 16958 CA-58, Mojave, CA, where it terminated travel at approximately 8:08 a.m. Surveillance then observed MONTIEL-ROMERO exit the maroon Ford sedan (CA 6LFF862), walk out of sight towards the motel, then return to the maroon Ford sedan (CA 6LFF862) with COOPER. MONTIEL-ROMERO and COOPER then departed the vicinity of the motel. Surveillance was able to confirm the individuals they observed were MONTIEL-ROMERO and COOPER by comparing what they observed to driver's license photos of MONTIEL-ROMERO and COOPER provided to them by TFO Torres.

46.    Surveillance followed the Maroon Ford sedan (CA 6LFF862) until it terminated travel in the vicinity of Corral Court, Helendale, CA. At approximately 9:43 a.m., surveillance observed a gray Mercedes registered to Jesus Manuel Bustamante at 68095 Estio Road, Cathedral City, CA arrive in the vicinity of the maroon Ford sedan (CA 6LFF862). MONTIEL-ROMERO then exited the maroon Ford sedan (CA 6LFF862) and interacted with the driver of the gray Mercedes, who was described as a Hispanic male adult. MONTIEL-ROMERO then opened a rear passenger door of the maroon Ford sedan (CA 6LFF862) while the unknown Hispanic male adult opened the trunk of the gray Mercedes. Surveillance then observed movement between the two vehicles, visually consistent with transferring items between the two vehicles. Surveillance then followed the gray Mercedes following the suspected drug transaction. GPS location data indicated that the maroon Ford sedan (CA 6LFF862) immediately began travelling northbound away from Helendale, CA, until visual surveillance of it was acquired by Tri-County Drug Enforcement Team (Trident) Detectives in Sacramento, CA. Surveillance then followed the maroon Ford sedan (CA 6LFF862) until it terminated travel in Yuba City, CA. Agents believe MONTIEL-ROMERO and COOPER picked drugs from Southern California and transported them to Northern California for further distribution as directed by GUZMAN TOLENTINO.

47.    Approximately three days later agents saw a similar pattern and communications involving GUZMAN TOLENTINO, COOPER, and MONTIEL ROMERO. Specifically, on August 14, 2025, at 7:04 p.m., GUZMAN TOLENTINO called COOPER using Target Telephone 3. During the call, GUZMAN TOLENTINO informed COOPER that "the guy" was leaving, and was going to wait for ten minutes at "the church." COOPER stated that it would take 15 minutes to get there. At 7:40 p.m., COOPER called GUZMAN TOLENTINO on Target Telephone 3. During the call, COOPER stated that he was at O'Reilly Auto Parts. GUZMAN TOLENTINO instructed COOPER to go to "the church."

48.    Court-authorized GPS data indicated that the maroon Ford sedan (CA 6LFF862) travelled to Southern California in the same manner as August 10 and 11, ultimately terminating travel at the apartment complex located at 2069 West San Bernardino Avenue, Colton, CA. On the morning of August 15, 2025, GPS data indicated that the maroon Ford sedan (CA 6LFF862) travelled to Corral Court, Helendale, CA, the same location it was observed meeting the gray Mercedes on August 11, 2025. The maroon Ford sedan (CA 6LFF862) then departed the vicinity of Corral Court and began travelling northbound away from Helendale, CA.

49.    On August 15, 2025 at approximately 6:22 p.m., Detectives with the California Multi-Jurisdictional Methamphetamine Enforcement Team (Cal-MMET) utilized GPS location data to locate and establish surveillance of the maroon Ford sedan (CA 6LFF862) as it travelled northbound on Interstate 5 towards Sacramento, CA.  At approximately 7:55 p.m., California Highway Patrol (CHP) Officer Austin Heredia and Officer Rey Garcia initiated a traffic stop of the maroon Ford sedan (CA 6LFF862) due to his observation of a California vehicle code violation. Officer stopped the vehicle on the side of Interstate 5 in Sacramento County near Elk Grove, CA. Upon approaching the vehicle, Officer Heredia and Officer Garcia observed that the vehicle was being operated by MONTIEL-ROMERO with COOPER in the front passenger seat. MONTIEL-ROMERO provided a form of Mexican government identification and COOPER self-identified as Lyle COOPER. CHP databases indicated that neither COOPER nor MONTIEL-ROMERO possessed a valid driver's license. MONTIEL-ROMERO was cited for a

vehicle code violation, then released from the scene of the vehicle stop with COOPER. Upon conducting a routine inventory of the maroon Ford sedan (CA 6LFF862), officers found approximately 51 pounds of methamphetamine in the vehicle as well as a ledger outlining drug transactions by date. The methamphetamine was packaged and visually consistent with methamphetamine seized in this and other investigations, and the mixture or substance seized by law enforcement was more than 500 grams.

**F.    Probable cause for Count 1 supporting arrest warrants for GUZMAN TOLENTINO, MONTIEL-ROMERO, and SEDGWICK: on August 10, 2025, August 12, 2025, and August 18, 2025, GUZMAN TOLENTINO and MONTIEL-ROMERO delivered methamphetamine to SEDGWICK for further distribution.**

50.    Prior to the interceptions over Target Telephone 3, in early June 2025, agents identified a vehicle registered to Brian SEDGWICK used to deliver five pounds of methamphetamine to a controlled purchase. Specifically, under the supervision of agents, CS-2 communicated with GUZMAN TOLENTINO in order to purchase 5 pounds of methamphetamine from GUZMAN TOLENTINO in Marysville, CA. On June 4, 2025, at approximately 6:07 p.m., the DEA Sacramento Task Force and supporting law enforcement officers established surveillance in the vicinity of the Costco located at 1214 North Beale Road, Marysville, CA, the predetermined meet location. At approximately the same time, GUZMAN TOLENTINO informed CS-2 that the meet would occur in 40 minutes.

51.    At approximately 8:01 p.m., GUZMAN TOLENTINO advised CS-2 to go to a new meet location and provided the vicinity of Washington Avenue and Clark Avenue in Yuba City, CA. In response, CS-2 proposed the Target (retail store) located at 1153 Butte House Road, Yuba City, CA as the new meet location, to which GUZMAN TOLENTINO agreed. Surveillance was then established at the Target.

52.    At approximately 9:28 p.m., surveillance observed a white Cadillac SUV (CA 8H58485) registered to Brian Keith SEDGWICK at P.O. Box 1434 Wheatland, CA, enter the parking lot of the meet location. At approximately the same time, GUZMAN TOLENTINO advised CS-2 that GUZMAN TOLENTNO's runner was "two minutes" away from the meet

location. Surveillance then observed the white Cadillac SUV park next to CS-2's vehicle. Surveillance then observed an unknown male adult exit the front passenger seat of the white Cadillac SUV, access the front passenger area of the white Cadillac SUV, walk to the front passenger door of CS-2's vehicle with a package in-hand, then enter CS-2's vehicle. Once in CS-2's vehicle, the unidentified male sold 5 pounds of methamphetamine to CS-2 in exchange for DEA official advanced funds.  Surveillance then observed the unidentified male exit CS-2's vehicle, return to the front passenger seat of the white Cadillac SUV, then depart the meet location as the passenger of the white Cadillac SUV.

53.     Following the controlled purchase, surveillance observed the white Cadillac SUV travel from the meet location to the vicinity of 1312 Washington Avenue, Yuba City, CA. The white Cadillac SUV then made multiple stops, ultimately terminating travel in the vicinity of 1325 I Street, Marysville, CA, where surveillance was terminated.  Although agents could not see the operator of the white Cadillac on June 4, 2025, agents encountered Brian SEDGWICK and the white Cadillac during surveillance done in connection with intercepts over Target Telephone 3.

54.     On August 10, 2025, at 10:09 a.m., GUZMAN TOLENTINO called an individual later confirmed to be Brian SEDGWICK using Target Telephone 3. During the call, GUZMAN TOLENTINO instructed SEDGWICK to go to "O'Reilly parts."  On the same date, detectives with the YCSO POP team were on surveillance in conjunction with this investigation. At approximately 10:20 a.m., Sergeant Machuca observed MONTIEL-ROMERO operating his blue Honda sedan (CA 9HUN360) in the vicinity of the O'Reilly Auto Parts located at 839 Colusa Avenue, Yuba City, CA. MONTIEL-ROMERO then parked the blue Honda sedan (CA 9HUN360) next to a silver Chrysler sedan (CA UIISLOW) registered to Brian SEDGWICK at P.O. Box 1434, 18800 Mathew Road, Wheatland, CA. MONTIEL-ROMERO then interacted with SEDGWICK through the driver's window of the blue Honda sedan (CA 9HUN360) while SEDGWICK was standing between the silver Chrysler sedan (CA UIISLOW) and the blue Honda sedan (CA 9HUN360). Sergeant Machuca had previously interacted with SEDGWICK

22

during prior law enforcement operations, and Sergeant Machuca recognized SEDGWICK as Sergeant Machuca observed MONTIEL-ROMERO and SEDGWICK make an exchange. SEDGWICK then returned to the silver Chrysler 300 and departed the vicinity of the O'Reilly Auto Parts.

55.    On August 12, 2025, at 1:06 p.m., GUZMAN TOLENTINO called SEDGWICK using Target Telephone 3. During the call, SEDGWICK stated that he had "the money" for the "other day," and that he needed "three." GUZMAN TOLENTINO instructed SEDGWICK to call once he was "in town," to which SEDGWICK acknowledged that he would.  Later that day at 3:28 p.m., SEDGWICK called GUZMAN TOLENTINO on Target Telephone 3. During the call, SEDGWICK stated that he needed "three and a half." GUZMAN TOLENTINO asked where he could meet SEDGWICK, to which SEDGWICK stated that he was at the "motel in Marysville."

56.    On the same date, detectives with SSO SIB and NET-5 were conducting surveillance in conjunction with this investigation. At approximately 3:55 p.m., Detective Roper observed MONTIEL-ROMERO park his blue Honda sedan (CA 9HUN360) in the vicinity of the Town House Motel located at 322 Ninth Street, Marysville, CA. Detective Roper then observed SEDGWICK park his silver Chrysler sedan (CA UIISLOW) next to MONTIEL-ROMERO's blue Honda sedan (CA 9HUN360). Detective Roper also had previously interacted with SEDGWICK in prior law enforcement operations, and Detective Roper recognized SEDGWICK. MONTIEL-ROMERO then exited the blue Honda sedan (CA 9HUN360) carrying a plastic grocery bag and interacted with SEDGWICK through the driver's window of the silver Chrysler sedan (CA UIISLOW). MONTIEL-ROMERO then returned to the blue Honda sedan (CA 9HUN360) and departed the vicinity of the Motel, followed by surveillance.

57.    On August 18, 2025, at 3:09 p.m., GUZMAN TOLENTINO called SEDGWICK using Target Telephone 3. During the call, SEDGWICK ordered "a half." GUZMAN TOLENTINO instructed SEDGWICK to meet at the "O'Reilly parts" in 30 minutes.

58.    On the same date, detectives with TRIDENT were conducting surveillance in conjunction with this investigation. At approximately 4:24 p.m., Detective Cooney observed a

silver Cadillac SUV (CA 8H58485) registered to Brian SEDGWICK at P.O. Box 1434,
Wheatland, CA[3] arrive and park in the vicinity of the O'Reilly Auto Parts located at 839 Colusa
Avenue, Yuba City, CA. At approximately 4:37 p.m., MONTIEL-ROMERO's blue Honda sedan
(CA 9HUN360) arrived in the vicinity of the O'Reilly Auto Parts and parked next to the silver
Cadillac SUV (CA 8H58485). The driver of the silver Cadillac SUV (CA 8H58485) then exited
the vehicle, interacted with the driver of the blue Honda sedan (CA 9HUN360), and then
returned to the silver Cadillac SUV (CA 8H58485). Both vehicles then departed the vicinity of
the O'Reilly Auto Parts separately. Surveillance followed the blue Honda sedan (CA 9HUN360).

59.     Based on the above information, I believe that SEDGWICK drove GUZMAN
TOLENTINO's courier on June 4, 2025 to complete the controlled substance transaction
between CS-2 and GUZMAN TOLENTINO.  Additionally, I believe that SEDGWICK received
a supply of methamphetamine for further distribution from GUZMAN TOLENTINO.
Specifically, on August 10, 2025, SEDGWICK met with MONTIEL-ROMERO at a location
provided by GUZMAN TOLENTINO.  I believe that MONTIEL-ROMERO provided
methamphetamine to SEDWICK on consignment because SEDGWICK called GUZMAN
TOLENTINO two days later to confirm that SEDWICK had money for "the other day."  During
this call and on a follow up call, SEDGWICK ordered "three" and changed the order to "three
and a half," which I believe to be three and a half pounds of methamphetamine.  Later, officers
saw SEDWICK meet with MONTIEL-ROMERO for what I believe was a methamphetamine
transaction.  Then, on August 18, 2025, I believe we overheard and observed another
methamphetamine transaction between GUZMAN TOLENTINO and SEDGWICK, this time for
"a half" or one-half pound of methamphetamine.

[3] I note that this vehicle is the same silver Cadillac which drove to the controlled purchase on June 4, 2025, detailed
above.

24



61.     On the same date, surveillance from the YCSO POP team, NET-5, and DEA Sacramento Task Force were observing MONTIEL-ROMERO. At approximately 2:07 p.m., NET-5 Detective Roper observed MONTIEL-ROMERO enter the vicinity of El Bajio Market as the operator of his blue Honda sedan (CA 9HUN360). MONTIEL-ROMERO then parked in the vicinity of a white Chrysler minivan (LA N678337) registered to a rental company. MONTIEL-ROMERO then retrieved two bags from the back of the blue Honda sedan (CA 9HUN360), then transferred them into the white Chrysler minivan (LA N678337). Moments later, MONTIEL-ROMERO moved one of the bags back into the blue Honda sedan (CA 9HUN360), entered the blue Honda sedan (CA 9HUN360), then departed the vicinity of El Bajio Market.  At 2:17 p.m., ▇▇▇▇▇ called GUZMAN TOLENTINO on Target Telephone 3. During the call, ▇▇▇▇▇ stated that "everything is good," and thanked GUZMAN TOLENTINO.

62.     On August 18, 2025, at 4:34 p.m., ▇▇▇▇▇ called GUZMAN TOLENTINO on Target Telephone 3. During the call, ▇▇▇▇▇ complained to GUZMAN TOLENTINO about the "last one," stating that it smelled like Raid bug spray. GUZMAN TOLENTINO stated that the new batch was "White, really white." GUZMAN TOLENTINO asked ▇▇▇▇▇ when he was coming, to which ▇▇▇▇▇ stated, "tomorrow or the next morning." ▇▇▇▇▇ stated that he needed "maybe twenty" and stated that his customers wanted the "water based one." ▇▇▇▇▇ then gave the phone to a female who stated, "Si, me quieres" in broken Spanish, indicating that they wanted what GUZMAN TOLENTINO was offering. The female then stated

25

"Si, me entiendes todo, no hablar bien. [attempting to say: I understand everything, but I don't speak Spanish well.]" ▮▮▮▮▮ then stated that he and the unknown female would stay at a hotel "tomorrow night" and would be able to meet GUZMAN TOLENTINO "tomorrow night or the next morning."

63.    On August 20, 2025, GUZMAN TOLENTINO called ▮▮▮▮▮ using Target Telephone 3. During the call, GUZMAN TOLENTINO addressed ▮▮▮▮▮ as "Coy." GUZMAN TOLENTINO stated that he wanted to get "more," so he needed the money from ▮▮▮▮▮ ▮▮▮▮▮ asked if GUZMAN TOLENTINO could meet in Corning, CA at 5:00 p.m., to which GUZMAN TOLENTINO agreed. ▮▮▮▮▮ stated that he needed "twenty."

64.    At 4:30 p.m., ▮▮▮▮▮ sent a text message to Target Telephone 3 stating "5 pm rolling hills." I note that there is a Rolling Hills Casino and Resort located at 2655 Everett Freeman Way, Corning, CA. At 5:52 p.m., ▮▮▮▮▮ sent a text message to Target Telephone 3 stating "I'm in a silver van by the flag poles." At 5:57 p.m., GUZMAN TOLENTINO called ▮▮▮▮▮ using Target Telephone 3. During the call, GUZMAN TOLENTINO informed ▮▮▮▮▮ that the driver was "there already." A female present with ▮▮▮▮▮ then stated they "they" were there "as soon as they go in by the flag pole."

65.    At time of the outlined calls special agents with the CDCR FAT team were conducting surveillance on MONTIEL-ROMERO and COOPER. MONTIEL-ROMERO was operating the blue Honda sedan (CA 9HUN360), and COOPER was operating a blue Chevrolet HHR registered to Lyle COOPER at 5130 Chestnut Road, Olivehurst, CA. MONTIEL-ROMERO and COOPER travelled in tandem from the O'Reilly Auto Parts at 839 Colusa Avenue, Yuba City, CA to the Rolling Hills Casino and Resort in Corning, CA.

66.    At approximately 6:00 p.m., Special Agent Leflore observed MONTIEL-ROMERO and COOPER park their vehicles on the north side of the parking lot of the Rolling Hills Casino and Resort, exit their vehicles, then loiter outside their vehicles. SA Leflore then observed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████

██████████████

67.    Following the arrival of the silver Dodge minivan (CA 6CWR356), SA Leflore observed MONTIEL-ROMERO retrieve an orange bucket from the blue Honda sedan (CA 9HUN360) and then enter the silver Dodge minivan (CA 6CWR356). Moments later, MONTIEL-ROMERO exited the silver Dodge minivan (CA 6CWR356) with the orange bucket, entered the blue Honda sedan (CA 9HUN360), and departed the casino, followed by COOPER operating the blue Chevrolet HHR. The silver Dodge minivan (CA 6CWR356) departed the vicinity of the casino and began travelling northbound away from Corning, CA on the Interstate 5 freeway, followed by surveillance.







**H.    Probable Cause for Counts 1 and 4 supporting arrest warrants for GUZMAN TOLENTINO, WHITELEY, and MONTIEL-ROMERO: on August 26, 2025, GUZMAN TOLENTINO, WHITELEY, and MONTIEL-ROMERO possessed with intent to distribute 61 pounds of methamphetamine seized by law enforcement.**

74. On August 17, 2025, at 5:17 p.m., a caller later identified as James WHITELEY called GUZMAN TOLENTINO on Target Telephone 3. During the call, WHITELEY stated that he was "there." GUZMAN TOLENTINO asked what vehicle WHITELEY was driving, to which WHITELEY replied a "blue Impala." GUZMAN TOLENTINO stated that "he" would be there in 5 minutes.

75. On the same date, detectives with the YCSO POP team were conducting surveillance of MONTIEL-ROMERO. At approximately 5:31 p.m., Sergeant Machuca observed w blue Honda sedan (CA 9HUN360), which officers had previously seen operated by MONTIEL-ROMERO, arrive in the vicinity of the O'Reilly Auto Parts located at 839 Colusa Avenue in Yuba City, CA and park next to a blue Chevrolet sedan (CA 7PFL710) registered to Leon J Whiteley at 1844 18th Street, Olivehurst, CA. Sergeant Machuca observed that a Hispanic male adult was operating the blue Honda sedan (CA 9HUN360) and MONTIEL-ROMERO was in the front passenger seat. MONTIEL-ROMERO then exited the blue Honda sedan (CA 9HUN360), entered the blue Chevrolet sedan (CA 7PFL710), then departed the vicinity of the O'Reilly Auto Parts as the passenger of the blue Chevrolet sedan (CA 7PFL710). Surveillance followed the blue Chevrolet sedan (CA 7PFL710), noting that the blue Honda sedan (CA 9HUN360) did not travel with the blue Chevrolet sedan (CA 7PFL710). Surveillance then observed the blue Chevrolet sedan (CA 7PFL710) stop at the AMPM gas station located at 886 Colusa Avenue, Yuba City, CA. Sergeant Machuca confirmed the operator of the blue Chevrolet sedan (CA 7PFL710) to be Leon James WHITELEY by comparing what he observed in person to a booking photo of WHITELEY provided to him by TFO Torres. Surveillance attempted to follow the blue Chevrolet sedan (CA 7PFL710) following its departure from the AMPM; however, officers could not maintain visual of the vehicle as it travelled. Surveillance was then terminated.

76. On August 19, 2025, WHITELEY called GUZMAN TOLENTINO on Target Telephone 3. During the call, WHITELEY identified himself as "the driver from the other day." GUZMAN TOLENTINO then asked who was calling, to which WHITELEY replied "James."

30

Later in the conversation, WHITELEY stated that GUZMAN TOLENTINO owed WHITELEY "a half", to which GUZMAN TOLENTINO agreed.

77.     On August 20, 2025, at 4:08 p.m., WHITELEY called GUZMAN TOLENTINO on Target Telephone 3. During the call, WHITELEY stated that he wanted to speak to GUZMAN TOLENTINO directly since he was the one doing "it." WHITELEY asked if it was "the same as last time," to which GUZMAN TOLENTINO confirmed. WHITELEY stated that he was taking a lot of risk, and WHITELEY stated, "he could barely put it in the car, so it was a lot." GUZMAN TOLENTINO stated that he made $80 "a piece" and that he did not bring "more than 40." WHITELEY negotiated payment with GUZMAN TOLENTINO asking if "it" would be "one and a half," to which GUZMAN TOLENTINO replied that he could give WHITELEY "one and a quarter." GUZMAN TOLENTINO asked if it was "for sure" that WHITELEY was "going," to which WHITELEY confirmed. GUZMAN TOLENTINO instructed WHITELEY to be ready at 7:00 p.m.  I believe that in this call, WHITELEY agreed to transport 40 pounds of methamphetamine for GUZMAN TOLENTINO, and WHITELEY negotiated his fee for transporting the controlled substances.  In the negotiation, GUZMAN TOLENTINO claimed to profit $80 per pound (or $3,200 for the load) which if true helped negotiate a fair rate for the transport and if false understated earnings to pay WHITELEY a lower rate for transporting the methamphetamine.  Ultimately, GUZMAN TOLENTINO agreed to pay WHITELEY one and a quarter pounds of methamphetamine for transporting the methamphetamine.

78.     On August 25, 2025, at 12:46 p.m., GUZMAN TOLENTINO called WHITELEY using Target Telephone 3. During the call, WHITELEY proposed contributing money with GUZMAN TOLENTINO on a large load of methamphetamine in order to attain the same price as GUZMAN TOLENTINO, stating he could "put some money to get more than what I got from the job." GUZMAN TOLENTINO instructed WHITELEY to wait while GUZMAN TOLENTINO got a translator. GUZMAN TOLENTINO then passed Target Telephone 3 to an unknown female who was fluent in English. WHITELEY then explained that he would go "down there," that he would put in his "own money" to get the "good price," and that he would

31

also "haul" it. The unknown female explained what WHITELEY said to GUZMAN TOLENTINO. The unknown female adult explained to WHITELEY that GUZMAN TOLENTINO got "them" at $750, to which WHITELEY questioned, "a piece?" The unknown female confirmed. I believe that in this conversation, WHITELEY offered to chip in money for a large load of methamphetamine, and GUZMAN TOLENTINO quoted a wholesale volume price of $750 per pound of methamphetamine.  WHITELEY stated that he did not currently have money to contribute, but he would gather money over time. Later in the conversation, GUZMAN TOLENTINO asked if WHITELEY wanted "to go today," and WHITELEY asked, "where?" GUZMAN TOLENTINO stated, "over there, the same." The call was then dropped by the live monitoring system.

79.     At 12:56 p.m., GUZMAN TOLENTINO called WHITELEY using Target Telephone 3. During the call, GUZMAN TOLENTINO informed WHITELEY that he wanted WHITELEY to "go down there today" at 5:00 p.m. Later in the call, GUZMAN TOLENTINO stated that the "youngster" had money for "food and drinks" and all expenses, including "good motels." WHITELEY questioned if the "quarter" that was owed to him would be collected "right now" or when WHITELEY "goes tonight," to which GUZMAN TOLENTINO replied, "right now."

80.     At 6:48 p.m., GUZMAN TOLENTINO called WHITELEY using Target Telephone 3. During the call, GUZMAN TOLENTINO asked WHITELEY if he remembers where WHITELEY picked up the "driver" on Barrett Street, to which WHITELEY confirmed that he remembered. GUZMAN TOLENTINO then instructed WHITELEY to go "there" and not to O'Reilly Auto Parts. At approximately 6:58 p.m., YCSO POP Team Sergeant Machuca observed WHITELEY's blue Chevrolet sedan (CA 7PFL710) arrive in the vicinity of Basaldua Check Cashing located at 318 North Barrett Road, Yuba City, CA. Sergeant Machuca saw MONTIEL-ROMERO approach the blue Chevrolet sedan (CA 7PFL710) carrying a bag, entered the front passenger seat, and then departed as the passenger in the blue Chevrolet sedan (CA 7PFL710).  GPS location data for a court-authorized GPS device affixed to the blue Chevrolet

sedan (CA 7PFL710) indicated that the blue Chevrolet sedan (CA 7PFL710) travelled southbound away from Yuba City, CA, to the Clarion Hotel located at 2620 Buck Owens Boulevard, Bakersfield, CA.

81.     The following morning, on August 26, 2025, at approximately 6:20 a.m., TFO Torres and Sergeant Machuca established surveillance on the blue Chevrolet sedan (CA 7PFL710) at the Clarion Hotel in Bakersfield, CA. Shortly thereafter, TFO Torres saw WHITELEY and MONTIEL-ROMERO exit the hotel, walk to the blue Chevrolet sedan (CA 7PFL710), enter the vehicle, and depart the hotel together in the blue Chevrolet sedan (CA 7PFL710).

82.     At 10:55 a.m., GUZMAN TOLENTINO called WHITELEY using Target Telephone 3. During the call, GUZMAN TOLENTINO instructed WHITELEY to pass the phone to MONTIEL-ROMERO, to which WHITELEY complied. GUZMAN TOLENTINO then asked MONTIEL-ROMERO how long it would be before they arrived, to which MONTIEL-ROMERO replied, "thirteen minutes."   Utilizing the court-authorized GPS monitoring device affixed to the blue Chevrolet sedan (CA 7PFL710), TFO Torres and Sergeant Machuca conducted mobile surveillance on WHITELEY and MONTIEL-ROMERO as they travelled, ultimately terminating travel at Superior Grocers, located at 1033 Long Beach Boulevard, Long Beach, CA.

83.     At 11:33 a.m., GUZMAN TOLENTINO called WHITELEY using Target Telephone 3. During the call, GUZMAN TOLENTINO instructed WHITELEY to pass the phone to MONTIEL-ROMERO, to which WHITELEY complied. While on the phone with MONTIEL-ROMERO, GUZMAN TOLENTION could be heard speaking to another individual on a second phone in GUZMAN TOLENTINO's possession. GUZMAN TOLENTINO advised MONTIEL-ROMERO that "they" were in a "Tahoe." GUZMAN TOLENTINO then relayed MONTIEL-ROMERO and WHITELEY's location to the unknown individual who, judging by context, appeared to be in the vicinity of MONTIEL-ROMERO and WHITELEY. TFO Torres

then observed a Chevrolet Tahoe (CA ATIKIHC) registered to Herlinda Lechuga at 8642 Cedar Street, Bellflower, CA arrive and park next to the blue Chevrolet sedan (CA 7PFL710).

84.     The unknown individual communicating with GUZMAN TOLENTINO on his second phone instructed GUZMAN TOLENTINO to have MONTIEL-ROMERO enter the Chevrolet Tahoe (CA ATIKIHC), to which GUZMAN TOLENTINO complied. TFO Torres then observed MONTIEL-ROMERO exit the blue Chevrolet sedan (CA 7PFL710) carrying a bag, then enter the Chevrolet Tahoe (CA ATIKIHC). GUZMAN TOLENTINO then advised that the unknown male on the phone was going to depart, and that GUZMAN TOLENTINO would advise the unknown male if everything went well, to which the unknown male acknowledged.

85.     MONTIEL-ROMERO advised GUZMAN TOLENTINO that the money would be counted at the scene of the deal. GUZMAN TOLENTINO complained about the money being counted at the scene of the transaction stating that there was "no faith." An unknown individual then stated that it would not happen again. During the call, unknown individuals could be heard counting money and sounded as if they were using an electronic money counting machine. GUZMAN TOLENTINO, MONTIEL-ROMERO, and an unknown individual communicated about whether the agreed upon amount was $42,500 or $2,700, ultimately agreeing on $42,500.

86.     Later in the conversation, MONTIEL-ROMERO asked, "how many" there were, to which an unknown individual replied "sixty-one." During this period, TFO Torres observed MONTIEL-ROMERO and a Hispanic male adult later identified as CEJA-GONZALEZ exit the Chevrolet Tahoe (CA ATIKIHC), walk to the back of the vehicle, open the rear of the vehicle, retrieve a black bag from the back of the Chevrolet Tahoe (CA ATIKIHC), and place the black bag in the back seat of the blue Chevrolet sedan (CA 7PFL710). MONTIEL-ROMERO then entered the blue Chevrolet sedan (CA 7PFL710) while CEJA-GONZALEZ entered the Chevrolet Tahoe. MONTIEL-ROMERO and WHITELEY then departed in the blue Chevrolet sedan (CA 7PFL710), while CEJA-GONZALEZ departed in the black Chevrolet Tahoe (CA ATIKIHC), followed by TFO Torres and Sergeant Machuca. MONTIEL-ROMERO remained on the phone with GUZMAN TOLENTINO during the entirety of the transaction.

87.    GUZMAN TOLENTINO then asked MONTIEL-ROMERO if he was "away" from the source of supply, to which MONTIEL-ROMERO confirmed. GUZMAN TOLENTINO then complained about the way the transaction was conducted. GUZMAN TOLENTINO asked MONTIEL-ROMERO if the "work" was "pretty," to which MONTIEL-ROMERO confirmed.

88.    TFO Torres and Sergeant Machuca conducted surveillance on the Chevrolet Tahoe (CA ATIKIHC) until it terminated travel at a construction site.  Later, TFO Torres and Sergeant Machuca reestablished surveillance on the blue Chevrolet sedan (CA 7PFL710) utilizing the GPS tracking device to reacquire visual. TFO Torres and Sergeant Machuca then followed the blue Chevrolet sedan (CA 7PFL710) northbound on the Interstate 5 towards Sacramento, CA. In Elk Grove, CA, CHP Officer Frazier conducted a traffic stop on the blue Chevrolet sedan (CA 7PFL710) based upon an observed California Vehicle Code violation. CHP Officer Alexander Frazier noted WHITELEY as the driver of the Chevrolet Impala and MONTIEL-ROMERO as the right front passenger of the vehicle. CHP Officer Frazier deployed his controlled substance detection canine to perform a cursory search of the vehicle. The canine unit alerted to the presence of drugs in the vehicle. A subsequent search of the vehicle yielded a large duffle bag containing approximately 61 pounds of methamphetamine. WHITELETY was arrested and subsequently transported to the Sacramento County Jail where he was booked for violations of possession of a controlled substance for sale and transportation of methamphetamine for sale. MONTIEL-ROMERO was released on from the scene of the traffic stop.

**I.    Probable cause for Counts 1 and 5 supporting a complaint and arrest warrants for GUZMAN TOLENTINO and MUNOZ-GUZMAN: on September 4, 2025, GUZMAN TOLENTINO and MUNOZ-GUZMAN possessed with intent to distribute 40 pounds of methamphetamine seized by law enforcement.**

89.    On August 30, 2025, agents overheard several communications between ▬▬▬▬▬ and GUZMAN TOLENTINO where they organized the sale of methamphetamine from GUZMAN TOLENTINO to ▬▬▬▬  For instance, that day at 1:22 p.m., ▬▬▬▬ called GUZMAN TOLENTINO on Target Telephone 3, and ▬▬▬▬ asked if "they" could meet at the

store by ███████ house, to which GUZMAN TOLENTINO agreed. GUZMAN TOLENTINO requested that ███████ send him the address because the "driver" was new and did not have the address.

90.     Later that day, at 3:52 p.m., GUZMAN TOLENTINO called ███████ using Target Telephone 3. During the call, ███████ stated that he wanted "three" and an individual named James wanted "two and a quarter." GUZMAN TOLENTINO questioned whether the driver should bring "five," to which ███████ confirmed. At 4:35 p.m., ███████ called GUZMAN TOLENTINO on Target Telephone 3. During the call, GUZMAN TOLENTINO apologized to ███████ stating that the "driver" was new. GUZMAN TOLENTINO requested that ███████ stay on the phone until ███████ could see the driver. ███████ then confirmed that he could see the driver.

91.     At approximately 4:35 p.m., detectives with the YCSO POP team observed a blue Honda sedan (CA 9HUN360) registered to Mario Zuno-Godinez at 4899 Campbell Ave, Apt 4, San Jose, CA, arrive in the vicinity of New Stop Convenient Store located at 1299 Northgate Drive, Yuba City, CA. I note that the same blue Honda sedan (CA 9HUN360) had previously been observed on several occasions being operated by MONTIEL-ROMERO.

92.     Surveillance then observed the blue Honda sedan (CA 9HUN360) park next to ███████████████████████). An unknown Hispanic male adult then exited the blue Honda sedan (CA 9HUN360), retrieved a red and black bag from the blue Honda sedan (CA 9HUN360), placed the bag in the back of the ███████████████████), then departed the vicinity of the New Stop in the blue Honda sedan (CA 9HUN360). Surveillance followed ███████ as the operator of the ███████████████████) until ███████ terminated travel at his residential address of ███████████████████.

93.     Officers compared their surveillance observations to a booking photograph following MUNOZ-GUZMAN's September 4 arrest (discussed below), and officers recognized the driver of the blue Honda sedan on August 30 to be Juan MUNOZ-GUZMAN.  Thereafter, in

36

the following days, agents used CS-2 to arrange a methamphetamine transaction with GUZMAN TOLENTINO, which would be executed by MUNOZ-GUZMAN.

94.     On September 3, 2025, at approximately 6:35 p.m., surveillance units from the CDCR FAT team observed the same blue Honda sedan (CA 9HUN360) registered to Mario Zuno-Godinez at 4899 Campbell Ave, Apt 4, San Jose, CA, arrive in the vicinity of the intersection of Littlejohn Road and Countryside Drive in Yuba City, CA.

95.     At 6:44 p.m., ███████ called GUZMAN TOLENTINO on Target Telephone 3. During the call, GUZMAN TOLENTINO instructed ███████ to meet GUZMAN TOLENTINO's runner at a gas station "by Franklin and Walton." At 7:07 p.m., ███████ called GUZMAN TOLENTINO on Target Telephone 3. During the call, ███████ informed GUZMAN TOLENTINO that he had arrived.

96.     At approximately 7:07 p.m., surveillance observed █████████████████ ███████) arrive in the vicinity of 1591 Franklin Avenue, Yuba City, CA. Surveillance then observed a Hispanic male adult approach the █████████████████) then enter the white █████████████). The █████████████) then departed the Chevron and dropped off the Hispanic male adult on Littlejohn Road. By observing surveillance photos, I confirmed the Hispanic male adult to be Juan MUNOZ-GUZMAN based upon comparing my observations with a booking photograph following MUNOZ-GUZMAN's September 4 arrest (discussed below).

97.     On September 3, 2025, at 3:24 p.m., CS-2 received an incoming call from GUZMAN TOLENTINO. During the call, GUZMAN TOLENTINO stated, "you go with over there to Los Angeles with my driver, when do you want to go, tonight?" At 3:26 p.m., CS-2 called GUZMAN TOLENTINO to attain details on the trip. During the call, GUZMAN TOLENTINO informed CS-2 that CS-2 and an unknown individual would depart Yuba City on September 3, 2025, stay the night in Bakersfield, CA, pick up the methamphetamine on the morning of September 4, 2025, then return immediately after attaining the methamphetamine.

98.     At approximately 7:30 p.m., TFO Torres, Sergeant Machuca, TRIDENT Detective Coburn, and TRIDENT Detective Sartain met with CS-2 at a neutral location, and outfitted CS-2 with monitoring equipment in order to surveil CS-2 as CS-2 travelled with GUZMAN TOLENTINO's associate. At approximately 7:55 p.m., CS-2 parked CS-2's vehicle in the parking lot of WinCo Foods located at 1350 Franklin Road, Yuba City, CA, as directed by GUZMAN TOLENTINO. At the same time, Sergeant Machuca established surveillance in the vicinity of MUNOZ-GUZMAN's residence of 1504 Countryside Drive, Yuba City, CA. Officers initially identified 1504 Countryside Drive as an address of interest due to GPS data associated with the blue Honda sedan placing the vehicle in its vicinity overnight following surveillance observing MUNOZ-GUZMAN conduct drug transactions as directed by GUZMAN TOLENTINO. Then, Sergeant Machuca observed MUNOZ-GUZMAN depart 1504 Countryside Drive on foot, walk to the WinCo Foods where CS-2's vehicle was parked, and enter CS-2's vehicle.

99.     CS-2's vehicle left the WinCo Foods, followed by surveillance, and CS-2's vehicle terminated travel at the Springhill Suites Hotel located at 3801 Marriott Drive, Bakersfield, CA. CS-2 then exited the vehicle and entered the hotel. CS-2 alerted controlling agents that MUNOZ-GUZMAN had fallen asleep inside CS-2's vehicle.

100.    At 6:09 a.m., GUZMAN TOLENTINO called CS-2 asking about CS-2's whereabouts. CS-2 informed GUZMAN TOLENTINO that CS-2 and MUNOZ-GUZMAN were in Bakersfield, CA. Following the call, CS-2 returned to CS-2's vehicle, where MUNOZ-GUZMAN was still asleep. At 7:23 a.m., GUZMAN TOLENTINO called CS-2 and requested that CS-2 hand the phone to MUNOZ-GUZMAN. GUZMAN TOLENTINO instructed MUNOZ-GUZMAN to "count the money." GUZMAN TOLENTINO stated that he would send MUNOZ-GUZMAN "the address" thereafter.

101.    CS-2 and MUNOZ-GUZMAN began travelling southbound towards Los Angeles, CA, stopping briefly at the Granada Inn located at 15543 Rinaldi Street, Granada Hills, CA. Once in the parking lot of the Granada Inn, CS-2 informed TFO Torres that GUZMAN

TOLENTINO provided MUNOZ-GUZMAN with the address "11160 Balboa Boulevard." CS-2 and MUNOZ-GUZMAN then began travelling towards 11160 Balboa Boulevard, Granada Hills, CA. While driving to the meet location, CS-2 and MUNOZ-GUZMAN stopped at the In-N-Out fast-food restaurant located at 1455 Laurel Canyon Boulevard, San Fernando, CA, where CS-2 and MUNOZ-GUZMAN entered the restaurant. CS-2 and MUNOZ-GUZMAN then travelled to O'Reilly Auto Parts located at 1128 Pico Street, San Fernando, CA, where MUNOZ-GUZMAN purchased a can of automotive grease. CS-2 and MUNOZ-GUZMAN then travelled to the parking lot at 11160 Balboa Boulevard, Granada Hills, CA, as instructed by GUZMAN TOLENTINO.

102.    Following the arrival at the meet location, surveillance observed CS-2's vehicle park next to a black Honda sedan (CA 9DRX536). TFO Torres then observed an individual exit the black Honda sedan (CA 9DRX536) and enter the back seat of CS-2's vehicle.  Then, the individual from the black Honda sedan and MUNOZ-GUZMAN exited CS-2's vehicle, walked to the trunk of the black Honda sedan (CA 9DRX536), retrieve an orange shoe box, a black bag, and a white bag with green handles from the trunk.  Then, they placed the orange shoe box, black bag, and white bag with green handles in the trunk of CS-2's vehicle. MUNOZ-GUZMAN then entered CS-2's vehicle while the other individual entered the black Honda sedan (CA 9DRX536).

103.    Immediately following the transaction, surveillance followed CS-2 and MUNOZ-GUZMAN northbound towards Northern California. In Lodi, CA, CHP Officer Brasil conducted a traffic stop on CS-2's vehicle after observing a violation of a California vehicle code. Upon stopping CS-2's vehicle, MUNOZ-GUZMAN self-identified as Juan MUNOZ-GUZMAN to Officer Garcia who responded to the stop.  During the stop, the officers noted extreme nervousness as well as inconsistent stories about the nature of the trip, and the officers believed that reasonable suspicion supported the use of a K9 to check for controlled substances.  Upon conducting a canine open-air sniff of CS-2's vehicle, Officer Garcia's canine partner alerted to the odor of controlled substances. A subsequent search of the vehicle revealed approximately 40

pounds of methamphetamine, packaged in an orange shoe box, a black bag, and a white bag with green handles. MUNOZ-GUZMAN was arrested and booked in San Joaquin County Jail for violations of possession of a controlled substance for sale and transportation of methamphetamine for sale.

**J.    Probable Cause for Counts 6 and 7 supporting arrest warrants for GUZMAN TOLENTINO and EMERSON: on September 5, 2025, GUZMAN TOLENTINO distributed one-half pound of methamphetamine to EMERSON, and on that same day, EMERSON possessed with intent to distribute the one-half pound of methamphetamine seized by law enforcement.**

104.    On September 3, 2025, at 12:01 p.m., EMERSON called GUZMAN TOLENTINO on Target Telephone 3. During the call, EMERSON stated that she needed "two," to which GUZMAN TOLENTINO stated he would "see her in an hour." At 1:16 p.m., EMERSON called GUZMAN TOLENTINO on Target Telephone 3. During the call, EMERSON stated she wanted to "see" GUZMAN TOLENTINO "right now." GUZMAN TOLENTINO stated that he would send EMERSON an address to meet at, to which EMERSON acknowledged. At 1:26 p.m., GUZMAN TOLENTINO called EMERSON using Target Telephone 3. During the call, GUZMAN TOLENTINO instructed EMERSON to go to the Chevron gas station located at 1591 Franklin Road, Yuba City, CA.

105.    On the same date, the CDCR FAT team was assigned to conduct surveillance on MUNOZ-GUZMAN as he conducted drug transactions as the operator of the blue Honda sedan (CA 9HUN360) previously operated by MONTIEL-ROMERO. At approximately 2:15 p.m., Agent Bell observed a black Chevrolet Tahoe (OR 577KTT) registered to James Dagit at 91403 Kellogg Lane, Coos Bay, OR, arrive at the Chevron gas station. Shortly thereafter, Agent Bell observed the blue Honda sedan (CA 9HUN360) arrive at the Chevron. Surveillance then observed EMERSON interact with the driver of the blue Honda sedan (CA 9HUN360), return to her vehicle, then depart the vicinity of the Chevron. CDCR FAT did not identify the operator of the blue Honda sedan (CA 9HUN360) at the Chevron. However, CDCR FAT did identify the operator of the blue Honda sedan (CA 9HUN360) as MUNOZ-GUZMAN later that day during a

drug transaction between MUNOZ-GUZMAN and ████ as previously outlined in this complaint.

106.    Following the transaction, surveillance maintained visual of EMERSON as she travelled. Surveillance noted that the black Chevrolet Tahoe (OR 577KTT) was occupied by two females. At 2:21 p.m., EMERSON called GUZMAN TOLENTINO on Target Telephone 3. During the call, GUZMAN TOLENTINO stated that EMERSON was "playing" with his time, to which EMERSON stated that she got "it" already. The call dropped, then EMERSON immediately called GUZMAN TOLENTINO back on Target Telephone 3. During the call, GUZMAN TOLENTINO asked why EMERSON had ordered a "full one" but only purchased "a half." GUZMAN TOLENTINO then stated that he was "not playing fucking games." EMERSON then told GUZMAN TOLENTINO to read his messages.

107.    At approximately 2:31 p.m., while CDCR FAT was conducting surveillance on EMERSON as she travelled, Detective Hindo conducted a vehicle stop on the black Chevrolet Tahoe (OR 577KTT) for a violation of a California vehicle code. I note that Detective Hindo was in the capacity of a uniformed officer operating a marked vehicle. Detective Hindo recognized EMERSON as the driver from prior law enforcement operations. Detective Hindo also recalled that EMERSON had a suspended driver's license at the time of the stop. When asked about the status of her license, EMERSON stated that she was aware that her license was suspended, but she claimed that she was only making a short trip to drop off her aunt. The passenger of the black Chevrolet Tahoe (OR 577KTT) identified herself as Lisa Parker. Results of a query submitted to a law enforcement database confirmed that EMERSON's license was suspended, and the license was only valid to trips to and from EMERSON's employer. EMERSON confirmed that she was not commuting to or from work. Detective Hindo then elected to tow the black Chevrolet Tahoe (OR 577KTT). While conducting a routine inventory of the vehicle, Detective Hindo located a clear plastic bag containing one-half pound of methamphetamine (approximately 226 grams of methamphetamine). EMERSON was arrested for possession of a controlled substance for sale and transportation of methamphetamine for sale.

41











[REDACTED]

## V.    AUTHORIZATION REQUEST

125.    Based on the foregoing statement of probable cause, I request the court issue arrest warrants for the following individuals:

  i.  Erick GUZMAN TOLENTINO;

  ii.  [REDACTED];

  iii.  Elmer MONTIEL-ROMERO;

  iv.  Leon James WHITELEY;

  v.  Juan MUNOZ-GUZMAN;

  vi.  Lyle COOPER;

  vii.  [REDACTED];

  viii.  [REDACTED]

  ix.  Brandi EMERSON; and

  x.  Brian SEDGWICK.

126.    Additionally based upon the above statement of probable cause, I request that the Court issue a search warrant authorizing agents to search the following locations, all described more fully in attachment A:

      i.    The residence located at 2019 Hammonton-Smartsville Road, Space 51, Marysville, CA ("Subject Premises 4"); and

      ii.    The residence located at 554 Washington Avenue, Yuba City, CA ("Subject Premises 5").

127.    The authorization requested, if granted, would allow agents to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843 and 846 (distribution of and possession with intent to distribute controlled substances, use a facility of interstate commerce in furtherance of drug trafficking, and conspiracy to do the same). The items and evidence to be seized is more fully in Attachment B.

## VI.    REQUEST TO SEAL

128.    This Affidavit contains information regarding persons to be arrested as well as potential subject and targets of this investigation. This investigation is continuing, and the potential targets as well as the persons to be arrested are unaware of the investigation or the fact that they may be arrested. If unsealed, the information contained herein may jeopardize officers conducting the search warrants or attempting to execute the arrest warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation. The government also requests that it be allowed to provide this document to defense counsel to comply with its discovery obligations in a criminal proceeding without further order of Court.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

_____
Alexander Malik
Special Agent
Drug Enforcement Administration

Sworn to me over the telephone and SIGNED by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this __18th__ day of October 2025.

_____
Hon. Sean C. Riordan
United States Magistrate Judge

Approved as to form:

*/s/ Robert Abendroth*
Robert Abendroth
Assistant United States Attorney

**Attachment A**

**Locations to be Searched**

1.  The residence located at 2019 Hammonton-Smartsville Road, Space 51, Marysville, CA 95901:



The residence located at 2019 Hammonton-Smartsville Road, Space 51, Marysville, CA 95901 ("Subject Premises 4"), as depicted in the photograph above, is a single-story, single-family mobile home residence. The residence has a tan siding exterior with white trim. The numbers "51" are affixed above head-height in black numbering facing the sub-street that accesses the unit. The front door of the residence is on the south side of the mobile home, visible from the street. The alloted space and curtilage is lined by a white picket fence, approximately three feet tall. The property is accessible by a waist-high pedestrian gate. Subject Premises 4 includes all buildings, out-buildings, attached and detached garages, and real property located within the curtilage of 2019 Hammonton-Smartsville Road, Space 51, Marysville, CA. This warrant also authorizes the search of vehicles parked within the curtilage of Subject Premises 4.

2.  The residence located at 554 Washington Avenue, Yuba City, CA 95991:



The residence located at 554 Washington Avenue, Yuba City, CA 95991 ("Subject Premises 5"), as depicted in the photograph above, is a two-story, single-family residence with a gray asphalt composite roof.  The residence has a tan exterior with tan trim.  The numbers "554" appear in nickel numbering at head height to the left of the front door.  The front door of the residence faces Washington Avenue on a large porch area at the front of the residence. The property is lined by a wire fence, framed in wood. Subject Premises 5 includes all buildings, out-buildings, attached and detached garages, and real property located within the curtilage of 554 Washington Avenue, Yuba City, CA 95991.  This warrant also authorizes the search of vehicles parked within the curtilage of Subject Premises 5.

**Attachment B**

**Items to be Seized**

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A, including any digital devices, for evidence, fruits or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 843 and 846 (distribution of and possession with intent to distribute controlled substances, use a facility of interstate commerce in furtherance of drug trafficking, and conspiracy to do the same). These records and materials are more specifically described below:

1.    Controlled substances, including methamphetamine, fentanyl, or items frequently used to distribute methamphetamine and fentanyl or items containing residue from the distribution of methamphetamine and fentanyl; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.    United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase methamphetamine, fentanyl, and drugs during this investigation;

3.    Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.    Telephone paging devices, beepers, mobile and cellular phones, car phones, answering machines and tapes, and other communication devices which could be used in furtherance of possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and unlawful use of a communication facility, in violation of 21 U.S.C. § 843.

5.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.      Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.      Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11.      Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.